FILED
COURT OF APPEALS
DIVISION II

2013 MAR 26 AM 9:29

STATE OF WASHINGTON

BY_____
            DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re | No. 42660-9-II |
| JULIE ANN RILEY, | |
| Petitioner, | |
| and | |
| ROGER EUGENE HORTON, | UNPUBLISHED OPINION |
| Respondent. | |

QUINN-BRINTNALL, J. — Julie Riley and Roger Horton were involved in a committed intimate relationship from January 1990 to April 2008. Following their breakup, Riley and Horton equally divided all of their assets, except their retirement accounts, as previously agreed in a 2006 "Non-Marital Partnership Agreement" (the 2006 Agreement). They divided the assets without resort to the courts. Despite both parties substantively following the 2006 Agreement, in 2009, Riley filed a petition for equitable distribution of her and Horton's assets, seeking half of Horton's retirement accounts. After finding the parties' 2006 Agreement unenforceable in light of a mutual mistake of fact, the trial court reassessed the parties' property distribution and awarded Riley $69,000 to more equally distribute quasi-community assets.

Riley now appeals, arguing that (1) the parties created a new agreement in 2008 that the trial court failed to properly enforce; (2) the trial court abused its discretion by considering the decline in value of the family home now owned by Horton, while not simultaneously considering the decline in value of Riley's new home; and (3) the trial court erred in finding that part of Horton's retirement account at his new employer had not yet vested at the time the parties separated. Because all Riley's claims lack merit, we affirm.

## FACTS

BACKGROUND

Horton and Riley began dating in 1989 while both were in the process of divorce proceedings.[1] The couple moved in together in November 1989 and, in 1992, Riley gave birth to a daughter, Alex.[2] Following Alex's birth, Horton and Riley began pooling their resources, including purchasing a new home. Horton, Riley, and Alex lived together as a family for the next 16 years although Horton and Riley never married.

For most of their relationship, Horton worked for the Washington State Department of Transportation (WSDOT) as an engineer, having begun his career in 1977. Prior to entering the relationship with Riley, Horton had already contributed a sizeable sum of money to his PERS I retirement account. This was the only significant "separate" asset Horton brought into the new

---

[1] Riley's divorce became final in October 1989, and Horton's became final in December of that year.

[2] During the pendency of this litigation, paternity testing revealed that Horton was not the child's biological father, although the record reflects that this has not negatively impacted Horton's relationship with Alex.

relationship. Riley began working for WSDOT in 1994 and at the time the parties began their relationship, had no significant separate assets.

In 2005, Riley approached Horton about entering into the 2006 Agreement to protect them both in case of separation or death. Horton agreed and Riley found an attorney to prepare the agreement. The 2006 Agreement set forth which of the parties' assets would be considered "joint" property and which would be treated as "separate" property in case of separation. The most significant joint asset was the family residence. The parties' most significant separate assets were their individual retirement accounts; prior to executing the 2006 Agreement, Horton made clear to Riley that it was important for him to be able to retain his retirement accounts as separate property because his retirement accounts had been a contentious issue during his divorce.

The 2006 Agreement listed the "current value" of Horton's PERS I account, on December 31, 2005, as $171,444.69 and the value of his deferred compensation account as $47,752.91.[3] The 2006 Agreement listed the "current value" of Riley's PERS II account as of December 31, 2005, as $16,727.39 and the value of her deferred compensation account as $122,753.93. These numbers reflected the parties' *own* retirement contribution amounts, not the actual (or even estimated) value of the accounts. Both parties were advised that they had the right to consult an attorney of their choice prior to signing the agreement and both parties declined.

---

[3] Sometime after the parties executed the 2006 Agreement, Horton transferred all of his deferred compensation account into his PERS I account. Accordingly, the trial court did not separately address Horton's deferred compensation account when evaluating the parties' assets.

Riley and Horton separated less than two years after executing the 2006 Agreement and, in April 2008, Riley moved out of the family residence. Consistent with the 2006 Agreement, Horton bought out Riley's interest in the family home for approximately $150,000 and equally divided the rest of the parties' debts and assets, except their retirement accounts. Despite generally dividing the assets in accord with the 2006 Agreement, Riley filed a "Petition for Equitable Distribution from Meretricious Relationship" in October 2009.

PROCEDURE

At the July 2011 trial, the court addressed a number of issues, including whether the 2006 Agreement was enforceable and, if not, how the parties' assets and debts should be divided. Riley sought to have the 2006 Agreement deemed unenforceable while simultaneously asking the trial court to confirm the majority of the property division that occurred in 2008. Having already received one-half of the value of all of the parties' "joint" assets, Riley sought one-half of the portions of Horton's retirement accounts earned during their relationship. Horton sought confirmation of the parties' 2006 Agreement dividing joint assets equally while treating his and Riley's retirement accounts as separate property. In the event of a reassessment, Horton requested that the trial court value the family residence at the time of trial, rather than at separation, in light of the precipitous drop in the home's value since the housing market collapse.

At trial, Riley testified that she never understood how her and Horton's different retirement plans worked and, accordingly, failed to realize that Horton's retirement account was actually worth close to one million dollars (instead of the approximately $170,000 listed in the 2006 Agreement reflecting his own contributions). Riley also testified that at the time of separation, Horton agreed to equally divide everything, including the retirement accounts but after dividing all the other assets, he changed his mind:

4

No. 42660-9-II

As soon as I signed off on the house, he just laughed at me and said well, we're done. . . . He goes remember this? And he held up the agreement and laughed. And I said no, I don't know -- you know, what are you talking about? He goes it says right here in this agreement that we did that my retirement is mine and yours is yours.

1 Report of Proceedings (RP) at 64.

Horton testified that contrary to Riley's assertions, he and Riley had discussed their different retirement accounts frequently and at length and, further, that Riley understood the differences between their retirement accounts. At trial, Horton explained that

I was knowledgeable of what deferred comp is and I also knew what [the] PERS I and PERS II differences were. I knew she was going into PERS II, so I talked to her [in 1994] about the differences and how PERS II, you know -- the joke is you've got to work till you die, you've got to work till you're 65, and so if you want any ability to retire earlier you need to start hitting deferred comp as hard as you can. So we discussed that at the very beginning, and she started deferred comp right away.

1 RP at 188-89. Horton also testified that he "developed a spread sheet that showed [his and Riley's] potential financial resources" after retirement and that the couple reviewed that information periodically.[4] 1 RP at 189. He also stated that Riley knew of the contentious nature of his divorce and that she agreed that their retirement assets should be kept as separate property.

After the break up, Horton relied on the 2006 Agreement to divide his and Riley's assets. Horton memorialized the division of assets in a number of ways, including in a document entitled "Julie Riley and Roger Horton Asset Split," dated from April 2008, and another entitled

---

[4] A version of this spreadsheet was apparently admitted as an exhibit at trial but Riley has not designated it for our review on appeal.

"Bank Split," exhaustively detailing account balances and debts.[5] Unlike Riley, Horton never characterized the 2008 division of assets as a separate or "new" agreement.

On July 28, the trial court delivered its ruling. The court found that both parties were aware of the differences between the two retirement accounts, that Riley's testimony was not credible, and that Horton did not commit fraud or concealment in "failing to have present value numbers" for the PERS accounts listed in the 2006 Agreement. RP (July 28, 2011) at 13. Nevertheless, the court concluded that

> [a]s a consequence of neither party seeking independent counsel . . . there was a mutual mistake of fact with respect to this 2006 agreement and the mistake was very significant. None of the cases we have or that I have reviewed talk about a mutual mistake of fact, so this is a different theory than is discussed in the cases. But in fact that is what this case involves. There was no concealment. There was no failure to disclose. Everything about these assets was disclosed. I believe everything about the PERS retirement was known to both parties. . . .
> So here on the 2006 agreement was an asset of Mr. Horton listed with $177,000 value that was really worth about $900,000, and Ms. Riley's retirement was worth about five times also of the amount that was listed on that agreement. So I can only conclude that, although there was full disclosure of the nature and everything about the assets, the parties were mistaken about what the value of their assets were, and they were badly mistaken.

RP (July 28, 2011) at 19-20.

After creating this new "mutual mistake" theory, the trial court announced it would not enforce the 2006 Agreement. The trial court also ignored Riley's request to uphold the 2008 division of assets.[6] Instead, the court reevaluated all of the couple's assets and concluded,

---

[5] We note that in the "Asset Split" document, Roger agreed to pay more than half of all expenses related to Alex's care, including contributing 75 percent of the cost of a vehicle for Alex, paying for Alex's car insurance, covering 75 percent of all of Alex's medical expenses, and allowing Julie to claim Alex as a dependent for federal income tax purposes.

[6] In line with Horton's testimony, the trial court did not treat the 2008 division of assets as a new or separate property agreement reached by the parties independent of the 2006 Agreement.

I am satisfied from the documents that the parties equally divided the bank accounts as they existed in April 2008 and equally divided their personal property.

. . . .

These are the values that will be put on the balance sheet: The home, which is awarded to Mr. Horton, will be put on the balance sheet at a value of zero. Cash from the home equity loan in April 2008 was given to Ms. Riley. That was $150,000. That will be put on her side of the balance sheet. Ms. Riley has asked that an adjustment be made because the home which she purchased with the money has also declined in value, but it is my opinion that the Court does not examine how Ms. Riley chose to spend the money which she received from the property division of the parties. Accordingly, no adjustment will be made.

By the way, there were no values indicated as to what the purchase value was, what the current value is.

RP (July 28, 2011) at 22-24.

In addition, based on its own calculations,[7] the trial court concluded that the current value of Horton's PERS I account was $588,225, while the current value of Riley's PERS II account plus the value of her deferred compensation was $290,562. After accounting for the $150,000 Horton had already paid to Riley for the home, the trial court concluded that a $69,000 judgment to Riley would equitably distribute the quasi-community assets.[8] Despite the trial court's ruling in her favor, Riley appeals. Horton does not cross appeal.

---

[7] At trial, Riley called a certified public accountant to testify about the value of the parties' retirement accounts. But as the trial court noted in its ruling, the expert's testimony "was not crystal clear" and the court was not "entirely clear that all of [the expert's] assumptions were ones on which the Court would generally rely in making a careful analysis of present value" of retirement accounts. RP (July 28, 2011) at 9.

[8] This division of assets left Riley with approximately $509,562 and Horton with approximately $519,225.

7

DISCUSSION

FAILURE TO ENFORCE THE 2008 PROPERTY "AGREEMENT"

Riley contends that the trial court erred in failing to enforce the "2008 Agreement" and, accordingly, she is entitled to a judgment of $143,831.50 instead of the $69,000 awarded by the trial court. Because the record does not reflect that the parties created a new agreement in 2008 but, instead, merely effectuated the 2006 Agreement at the time they separated, Riley's argument is meritless.

Washington courts have long recognized the validity of separate property agreements made after a marriage, including informal oral agreements. *See, e.g., Gage v. Gage*, 78 Wash. 262, 265, 138 P. 886 (1914). Nevertheless, courts require that "clear and convincing evidence shows both the *existence of the agreement* and mutual observance of the agreement." *DewBerry v. George*, 115 Wn. App. 351, 359, 62 P.3d 525, *review denied*, 150 Wn.2d 1006 (2003) (emphasis added). "A court cannot, based upon general considerations of abstract justice, make a contract for parties which they did not make for themselves." *Wagner v. Wagner*, 95 Wn.2d 94, 104, 621 P.2d 1279 (1980).

On appeal, as at the trial court level, Riley simply asserts that the parties' 2008 *execution* of the 2006 Agreement constituted a new, separately enforceable property *agreement*. In support of this contention, Riley states that "*both* parties testified as to the existence of the 2008 Agreement, they both substantially complied with the 2008 Agreement, and documentary evidence was admitted establishing the terms of the 2008 Agreement." Br. of Appellant at 10 (footnotes omitted). Hardly any evidence, let alone the clear and convincing variety, supports this contention.

Exhibits 3 and 36 are the only documentary evidence before this court that could conceivably support the notion of a "new" 2008 Agreement. When read together, however, these exhibits do little more than establish that, for the most part, the parties split the nonretirement accounts equally, *exactly as called for in the 2006 Agreement.* For instance, exhibit 36 details the parties' bank accounts and debts and exhaustively plots what must happen to effectuate a 50/50 split of the assets. Along the same lines, exhibit 3 includes a table listing high dollar assets (like the house and cars) and high dollar debts (mortgages and car loans) and shows that for a 50/50 asset split with Horton keeping the house, Horton would need to transfer $150,038 to Riley.

Unlike the 2006 Agreement, these 2008 "agreements" were not signed by the parties or, for that matter, indicate that they are anything more than documents memorializing the execution of the 2006 Agreement at the time the parties separated in 2008. And although Riley asserts that both parties testified as to the existence of the "2008 Agreement," the record does not support this assertion. At trial, Riley stated that exhibit 3 was "a document that [Horton] put together trying to put on paper how we were gonna, how we should split our assets." 1 RP at 48. Riley presented no other evidence at trial to support the notion of a new agreement and independent review of the record reflects that Horton never testified to, nor discussed, a new 2008 agreement.

In her reply brief, Riley attempts to show how "[t]he numerous differences between the provisions of the [2006 Agreement] and the 2008 Agreement demonstrate that the parties entered a wholly new agreement." Reply Br. of Appellant at 3. The only differences she points this court to, however, involve Horton's purchase of Riley's share of the family residence. Language in the 2006 Agreement states that upon termination of the relationship, "either party shall have the option to buy out the interest of the other party in this property. Notice of an intention to

9

exercise the rights under this provision must be given in writing within thirty (30) days of the termination of this agreement." Clerk's Papers (CP) at 14. Despite Horton clearly exercising this option (and Riley's willingness to quitclaim her interest in the home in exchange for over $150,000), Riley contends that Horton could not have been exercising this option under the 2006 Agreement because Horton never notified Riley of his intent to buy her half of the property, *from her*, in writing. Riley's executing the quitclaim deed and her accepting $150,000 belies her lack of proper notice argument.

Equally frivolous, Riley asserts that because the 2006 Agreement called for each party to "select an appraiser who shall appraise the property," CP at 14, and, instead, only Horton had the house appraised, the parties "clearly" were operating under a new 2008 property agreement. At trial, however, Horton testified to the fact that Riley wanted to get her own appraisal but "called somebody and then cancelled at the last minute." 1 RP at 195. Riley's failure to get a second appraisal does not establish the existence of a new separate property agreement.

After declaring the 2006 Agreement unenforceable, the trial court refused to recognize the validity of the parties' 2008 division of assets and reassessed all of Horton and Riley's property (including their retirement accounts). In some instances, this reassessment favored Riley: the trial court recognized her right to a generous portion of Horton's retirement income. In other instances, the reassessment disfavored her, namely, when the trial court reassessed the value of the family home in light of the decline in the housing market. But no clear and convincing evidence in the record establishes the existence of a separately enforceable 2008 agreement between the parties. Accordingly, because courts should not "make a contract for parties which they did not make for themselves," we hold meritless Riley's contention that the parties created a new and separately enforceable 2008 agreement. *Wagner*, 95 Wn.2d at 104.

10

REASSESSMENT OF THE FAMILY RESIDENCE

Riley next argues that the trial court abused its discretion in valuing Horton's share of the family residence at the time of trial, rather than at the time of separation, without simultaneously accounting for the decline in value of her own home. Because Riley failed to present *any* evidence at trial concerning the decline in value of the home she bought with the proceeds she received from Horton's purchase of her share of their former home, the invited error doctrine precludes this argument.

Trial courts have broad discretion in valuing property and we will only overturn a trial court's valuation if there has been a manifest abuse of discretion. *In re Marriage of Gillespie*, 89 Wn. App. 390, 403, 948 P.2d 1338 (1997). Furthermore, trial courts have the discretion to value the parties' assets as of the time of trial, instead of the date of separation. *Koher v. Morgan*, 93 Wn. App. 398, 404, 968 P.2d 920 (1998), *review denied*, 137 Wn.2d 1035 (1999). Nevertheless, our Supreme Court has suggested that "[i]f the property is to be valued as of the date of trial rather than the date of separation, appreciation as well as depreciation in value should be considered in making an equitable division." *Lucker v. Lucker*, 71 Wn.2d 165, 168, 426 P.2d 981 (1967).

Here, the trial court explained its decision to devalue the worth of the family residence:

> In today's economy, both in settlement conferences and in trials dividing assets of parties to marriages and this type of relationship, I don't think it is fair to leave the party getting the real estate saddled with a high value on the house when at the time of trial there has been a dramatic decline in the value of the house.
>     There is nothing that the parties could have done of their own making to preserve the value as to what it was at the time of separation. It was a matter of the market.

RP (July 28, 2011) at 21-22. The trial court also recognized that "both parties suffer from that market decline." RP (July 28, 2011) at 22.

11

No. 42660-9-II

At trial, Riley failed to present any evidence that her new residence suffered the same kind of property value decline as Horton's. In contrast, Horton testified that the family residence was appraised at approximately $750,000 at the time of separation but only $550,000 at the time of trial. Riley testified only that she purchased a home for $445,000 after the relationship ended. The trial court recognized as much, stating in its oral ruling that "there were no values indicated as to . . . what the current value is" of Riley's home. RP (July 28, 2011) at 24.

Accordingly, even if the trial court erred in failing to consider the depreciation in value of Riley's home, which we do not hold, Riley *herself* was responsible for any error. Because the invited error doctrine prohibits a party from setting up an error at trial and then complaining of it on appeal, we conclude that Riley is precluded from raising this argument on appeal. *City of Seattle v. Patu*, 147 Wn.2d 717, 720, 58 P.3d 273 (2002).

THE EXELTECH ACCOUNT

Riley last argues that she is entitled to half of Horton's vested retirement account from his new employer, Exeltech, earned before their 2008 separation.[9] The trial court disagreed and found that "there was no relationship interest in that account" because it had not yet vested by the time of separation. CP at 83. Because substantial evidence supports the trial court's finding, we affirm the trial court's decision as related to the Exeltech account.

We review "findings of fact under a 'substantial evidence standard, defined as a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true.'" *Korst v. McMahon*, 136 Wn. App. 202, 206, 148 P.3d 1081 (2006) (quoting *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003)). This is a deferential standard, which

---

[9] After retiring from the State in April 2007, Horton began working as a consulting engineer for Exeltech.

12

views reasonable inferences in a light most favorable to the prevailing party. *Sunderland Family Treatment Servs. v. City of Pasco*, 127 Wn.2d 782, 788, 903 P.2d 986 (1995). If there is substantial evidence, then "a reviewing court will not substitute its judgment for that of the trial court even though it may have resolved a factual dispute differently." *Sunnyside Valley*, 149 Wn.2d at 879-80.

At trial, the parties presented conflicting evidence concerning the Exeltech account. Horton testified that by the time the parties separated in April 2008, his Exeltech retirement account had not yet vested "so the extra moneys if [he were] to quit that day would go back to [his] employer." 2 RP at 229. Riley did not testify specifically about the Exeltech account but submitted exhibit 12, an account statement for the period from January 1, 2008 to March 31, 2008. Although the summary appears to reflect that by March 31, 2008, $4,776.02 of the account had vested, a disclaimer states that "[t]he estimated 'vested balance' is only an illustration, and your plan is not bound by it. Only your plan administrator . . . can decide your vested account." Ex. 12.

In light of this disclaimer and Horton's testimony, the trial court reasonably inferred that Horton's retirement account had not yet vested by the time the parties separated (which was less than one year after Horton began work at Exeltech). Because Riley has pointed to no other evidence in the record supporting her argument, and this court is in no better position to decide this issue than the trial court, we defer to the trial court's judgment and conclude that Horton's Exeltech account had not yet vested at the time of separation. *Sunnyside Valley*, 149 Wn.2d at 879-80.

In conclusion, the record does not support Riley's contention that the parties created a new, separately enforceable property agreement in 2008, the trial court did not abuse its

No. 42660-9-II

discretion in considering the family home's declining value when it reassessed the parties' assets, and Riley fails to present evidence sufficient for us to conclude that the trial court erroneously ruled that Horton's Exeltech account had not vested by the time the parties split up. Accordingly, we affirm the trial court.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

QUINN-BRINTNALL, J.

We concur:

VAN DEREN, J.

WORSWICK, C.J.

14